FILED
2023 Jun-23  PM 03:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ANIL VARSHNEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. _____** |
| | ) | |
| **PARSONS CORPORATION, and** | ) | |
| **LLOYD J. AUSTIN, as** | ) | |
| **SECRETARY OF DEFENSE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Anil Varshney ("Mr. Varshney"), by and through his undersigned counsel, hereby states the following claims against Defendants Parsons Corporation and Lloyd J. Austin, as Secretary of Defense, United States Missile Defense Agency:

## JURISDICTION AND VENUE

1.      This is an action for relief to redress unlawful discrimination by Parsons Corporation ("Parsons") and Lloyd J. Austin, as Secretary of Defense and representative of the United States Missile Defense Agency ("MDA") (together, "Defendants") in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Alabama Age Discrimination in Employment Act ("AADEA"), Ala. Code § 25-1-20 *et seq.*

1

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367(a) (supplemental).

3.     Venue is proper in this district under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b)(2) because unlawful employment practices were committed in this district.

4.     The Court has personal jurisdiction over Defendants because (1) the claims asserted in this action arose from or are connected with discriminatory acts or omissions committed by them, in whole or in part, in or directed toward a resident of the State of Alabama; (2) they have committed discriminatory acts or omissions, directly or indirectly, that caused substantial harm in the State of Alabama; and/or (3) they have had continuous and systematic contacts with the State of Alabama by engaging in numerous activities in and that have had an effect in this state.

## PARTIES

5.     Mr. Varshney is an individual resident of Alabama over the age of nineteen years. He was an employee of Parsons and MDA, as defined by Title VII, the ADEA, and the AADEA. Mr. Varshney worked for MDA from approximately January 2002 through October 3, 2022 and worked for Parsons from approximately July 2011 through October 6, 2022.

6.     Parsons is a corporation with headquarters located in Centreville, Virginia. Parsons maintains offices and does business on the Redstone Arsenal in

and around Huntsville, Alabama. Parsons is engaged in an industry affecting commerce, has fifteen (15) or more employees, and is an employer as defined by Title VII, the ADEA, and the AADEA.

7.     Lloyd J. Austin is the Secretary of Defense and legal representative for MDA, an agency of the United States Department of Defense. MDA maintains offices and does business on the Redstone Arsenal in and around Huntsville, Alabama. MDA is engaged in an industry affecting commerce, has fifteen (15) or more employees, and is an employer as defined by Title VII, the ADEA, and the AADEA.

## CONDITIONS PRECEDENT

8.     On November 16, 2022, Mr. Varshney timely initiated contact with MDA's Equal Employment Office. He filed his Pre-Complaint of Discrimination, alleging discrimination by MDA based on race, color, national origin, and age. A copy of the MDA Pre-Complaint is attached hereto as Exhibit A.

9.     Mr. Varshney received a Notice of Rights from MDA's EEO Counselor on February 1, 2023. A copy of the Notice of Rights is attached hereto as Exhibit B.

10.     On February 14, 2023, Mr. Varshney timely filed a Complaint of Discrimination in the Federal Government, MDA Case No. 2023-MDA-00003, alleging discrimination by MDA based on race, color, national origin, and age. A copy of the MDA Complaint is attached hereto as Exhibit C.

11.    Mr. Varshney received a Notice of Rights from MDA's Equal Employment Office on March 31, 2023 ("MDA Notice of Rights"). A copy of the MDA Notice of Rights is attached hereto as Exhibit D.

12.    Meanwhile, on December 20, 2022, Mr. Varshney filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 420-2023-00903, alleging discrimination by Parsons based on race, color, national origin, and age. A copy of the EEOC Charge is attached hereto as Exhibit E.

13.    Mr. Varshney received a Notice of Right to Sue from the EEOC on June 20, 2023 ("Parsons Notice of Rights"). A copy of the Parsons Notice of Rights is attached hereto as Exhibit F.

14.    This lawsuit is filed within ninety (90) days of the receipt of both the MDA Notice of Rights and the Parsons Notice of Rights.

15.    Mr. Varshney has fully complied with all prerequisites to jurisdiction in this Court under Title VII and the ADEA. This lawsuit is also timely filed under the AADEA.

## FACTUAL ALLEGATIONS

16.    This case arises out of Defendants' intentional acts to end Mr. Varshney's highly distinguished engineering career because he is a 78-year-old Indian American. Defendants abruptly terminated Mr. Varshney after one of his

white colleagues overheard him speaking Hindi to his dying brother-in-law in India and falsely reported him for a violation of "security regulations." Mr. Varshney accepted the call from his brother-in-law in an empty cubicle and spoke to him for approximately two minutes. Despite there being no policy prohibiting the call, and without any investigation, Defendants claimed Mr. Varshney committed a serious security violation and fired him. Worse, they blackballed him from future MDA work, effectively ending his career and life of service to MDA and the United States government. As demonstrated below, Defendants' reasons were a pretext for discrimination based on Mr. Varshney's race, skin color, national origin, and/or age.

### Mr. Varshney's Background

17.     Mr. Varshney was born in India in 1944. He immigrated to the United States in 1968, and his wife, Mrs. Shashi Varshney, immigrated one year later. Mr. Varshney has a Bachelor's Degree in Mechanical Engineering from Banaras Hindu University and a Master's Degree in Industrial and Systems Engineering from Oklahoma State University.

18.     The Varshneys settled in Huntsville, Alabama, became American citizens, and devoted their lives to the United States government.[1] They raised three successful children, who are Rhodes scholars, entrepreneurs, doctors, and businesspersons.

---

[1] Mrs. Shashi Varshney has been employed by federal agency the National Aeronautics and Space Administration (NASA) for over thirty years, since 1989.

19.   Mr. Varshney literally achieved the "American Dream," and his career working on MDA's most important projects was nothing short of exemplary.

**Mr. Varshney's Employment with MDA and Parsons**

20.   Mr. Varshney began working for MDA in 2002 as a Senior Systems Engineer at the MDA building in Huntsville, Alabama, and continued working there for over twenty years.

21.   MDA has contracted with Parsons since the early 1980s to provide engineering, analysis, and management support. In 2011, Parsons was awarded the contract that Mr. Varshney was working on for MDA. From that point, Mr. Varshney was jointly employed by MDA and Parsons and/or Parsons and MDA began acting as a single employer of Mr. Varshney. He worked as a Senior Systems Engineer at the MDA building in Huntsville under the supervision of employees of both Parsons and MDA, including Cary Boyd ("Boyd"), Brock Owens ("Owens"), and David Lair ("Lair") (all white men in their 40s or 50s).

22.   Mr. Varshney worked with employees of both Parsons and MDA, and was not identified in the workplace as a separate employee of Parsons or MDA. He was subject to the policies of both Parsons and MDA. MDA retained the right to control the means and methods by which Mr. Varshney completed MDA's projects.

23.   Over the course of his career, Mr. Varshney developed and maintained an excellent reputation among his colleagues and supervisors. He was never

disciplined and received many accolades and awards for his work, including "Contractor of the Year" award in Systems Engineering, a letter of recommendation from MDA's Program Manager for saving $5 million on the Ground-based Missile Defense program, and numerous "Employee of the Month" awards. His job required a very high level of skill/expertise and he was a trusted employee with Secret level clearance who worked on some of MDA's most innovative and sophisticated projects. Mr. Varshney's work included providing engineering support for the development of integrated and layered missile defense systems which defend the United States and allied partner forces against ballistic missile threats. He provided capability requirements analysis, system verification, and specification development for defense weapons systems and components; worked to identify and satisfy customer needs; and resolved issues across organization boundaries.

24.    Most recently, Mr. Varshney worked on MDA's $2.2 billion Technical, Engineering, Advisory, and Management Support (TEAMS)–Next Systems Engineering contract, which is currently funded through 2026. The project is committed to advancing MDA's mission of developing and deploying layered missile defense systems that protect national security, deployed forces, and allied forces from missile attacks in all phases of flight.

25.     Despite being 78 years old, it was well known to Mr. Varshney's colleagues and supervisors at MDA and Parsons that he intended to continue working and had no intention to retire.

## The Deathbed Call

26.     On Monday, September 26, 2022, Mr. Varshney was working at the Huntsville MDA site, on the second floor of the MDA building. He received a video call from his elderly brother-in-law, Mr. K.C. Gupta ("Mr. Gupta"). Mr. Gupta was on his deathbed in India and called to say goodbye to Mr. Varshney. Knowing the dire situation and that he may never have the opportunity to speak to Mr. Gupta again, Mr. Varshney stepped into an empty cubicle and accepted the call. Before doing so, he made sure there were no classified materials or anything else pertaining to MDA's or Parsons' work anywhere near him. The two spoke for approximately two minutes in Hindi.

27.     Owens walked by and saw and heard Mr. Varshney speaking Hindi to Mr. Gupta. Owens interrupted Mr. Varshney and asked whether he was on a video call, which Mr. Varshney confirmed. Owens told Mr. Varshney that the call was not allowed and Mr. Varshney immediately hung up. The call was the last time they spoke before Mr. Gupta passed away.

28.     Upon information and belief, Owens was intimidated by Mr. Varshney speaking in a language he did not understand. Without any further discussion with

8

Mr. Varshney, and with the intentional purpose to discriminate against Mr. Varshney and have him terminated, Owens falsely and intentionally reported to MDA and/or Parsons that Mr. Varshney committed a security violation by revealing confidential information and/or accepting this call during a confidential meeting or with confidential information in the background of the call.

29.     As Owens knew, there was no confidential or classified information anywhere near the call. The cubicle where Mr. Varshney accepted the video call was completely empty with no office material or wall hangings in the cubicle, and there was no confidential information being exchanged nearby. Due to COVID protocols, there were only two other employees on the entire floor, including Owens.

30.     There is no policy, rule, or regulation of either Parsons or MDA that prevented or prohibited Mr. Varshney from accepting the call from his dying brother-in-law. Neither Parsons nor MDA ever instructed or communicated to Mr. Varshney that such a call was prohibited. In fact, cell phones are expressly permitted in the Huntsville MDA building as long as they are not taken inside classified conference rooms or used during classified meetings.

**Mr. Varshney's Termination**

31.     A week later, on or about October 3, 2022, on his way to work, Mr. Varshney received a call from his Parsons supervisor, David Lair. Lair told Mr.

Varshney that his "privileges at MDA [had] been revoked" and to meet him at the MDA office.

32.    When Mr. Varshney arrived, Lair and MDA security personnel met him in the lobby, escorted him to his cubicle, and instructed him to pack up his personal belongings. MDA security personnel opened and searched through every file in his cubicle and through his personal belongings. Mr. Varshney was humiliated and Defendants were essentially accusing him of being a spy simply for speaking in a foreign language to a dying family member. Mr. Varshney was then escorted to his car by MDA security personnel. At his car, MDA security personnel again searched all of Mr. Varshney's personal belongings. Mr. Varshney was not provided any opportunity to explain the situation or refute any inaccuracies that had been reported by Owens, either to Parsons or to MDA.

33.    The next day, on October 4, 2022, Mr. Varshney received an email from Kim Adams, Parsons' Facility Security Officer ("FSO") in Colorado Springs. The email stated, "Since you are no longer supporting MDA, we will need to debrief you of your accesses for your security clearance. Should you find another position that requires a security clearance, we can pick up your clearance again in support of that contract."

34.    Two days later, on or about October 6, 2022, Mr. Varshney received a letter from Parsons with the subject "Notification of Termination." The letter falsely

stated that Mr. Varshney had committed a "Major Offense" by violating government security regulations. It further provided "Parsons was notified that [Mr. Varshney] violated government security regulations when [he] used the Facetime application on [his] personal phone at the classified worksite." The letter stated that "Parsons was also reminded that you had 2 previous security violations for connecting a thumb-drive to your work issued computer."

35.     Despite there being no discussion with Mr. Varshney, much less any kind of legitimate investigation, the letter stated that Mr. Varshney's employment with Parsons was being terminated, effective immediately.

36.     Before October 6, 2022, aside from Owens's verbal statement that his video call was not allowed, Mr. Varshney had never been informed that he had engaged in any activity that was considered to be a security violation, whether for video calls, thumb drives, or anything else. Mr. Varshney had received no prior notifications or warnings relating to these alleged incidents and had never been contacted by either Defendants' FSO about a security violation. And, he had not been the subject of any inquiry or investigation into any of these alleged incidents. He has never taken his cell phone into a classified meeting, and did not have two prior security violations relating to the use of a thumb drive in a computer.

37.     Further, Mr. Varshney had received no training that video calls are prohibited or considered a Major Offense even when conducted in empty areas. This

has been confirmed by several other employees of Defendants, none of whom are aware of any policy or regulation prohibiting video calls in empty areas.

38.    Defendants departed from their ordinary protocols to discriminate against Mr. Varshney and end his career, providing him with no due process or recourse to dispute the falsified allegations. Defendants have since admitted that they made no attempt to investigate the truth or veracity of any of the allegations against Mr. Varshney or to determine whether any security violation had ever been committed by Mr. Varshney. Instead, they falsified the reasons for Mr. Varshney's termination and/or relied on a falsified report that Mr. Varshney had committed a security violation before summarily and abruptly terminating him and, upon information and belief, replacing him with a younger, white person. Although Lair administered Mr. Varshney's termination, upon information and belief, the termination decision was made by Defendants' more senior personnel.

39.    Further, Parsons has admitted that it had no independent information about the video call and terminated Mr. Varshney at MDA's behest. Despite having over 15,000 employees and contracts with many other government agencies and groups, Parsons made no attempt to assign Mr. Varshney to another position or locate another placement in which he could work with another agency.

**Mr. Varshney's Disparate Treatment**

40.     Parsons posits itself as a "global leader" focused on security, defense, and infrastructure, and it touts Diversity, Equity, and Inclusion as fundamental pillars of the company's culture. For example, on its website, Parsons highlights flashy diversity award emblems and statistics. Its website states:

> Your Voice Matters. We're powered by our people. Our intelligent, diverse professionals come from myriad backgrounds, but we all share a common quest. Parsons is committed to an inclusive culture that rewards excellence and supports the success of all our employees. We respect your unique voice and celebrate you for who you are. Here — you can thrive.

See https://www.parsons.com/diversity-equity-inclusion/.

41.     Federal agency MDA also claims to be committed to diversity:

> MDA values every bright mind that helps us meet our goal. For that reason, we've cultivated an environment where each applicant and employee are offered an opportunity for equal advancement and recognition, regardless of gender, cultural background, or disability. . . . We recognize that diversity includes, but is not limited to, personal life experiences, geographic background, socioeconomic background, cultural knowledge, educational background, work background, language abilities, physical abilities, philosophical and spiritual perspectives, age, race, ethnicity, and gender. As an agency, we will approach diversity as a composite of these individual characteristics, experiences, and abilities consistent with the MDA's core values.

See https://www.mda.mil/careers/diversity.html.

42.    In practice and reality however, the vast majority of Defendants' employees are white and Defendants created and fostered an environment that permitted, and possibly encouraged, unlawful discrimination based on Mr. Varshney's race, color, national origin, and/or age. Among other things, Defendants failed to properly train their employees regarding anti-discrimination and anti-harassment of coworkers. Defendants should be held to a high standard of conduct especially since both operate from government funding fueled by United States tax dollars.

43.    Despite decades of work on behalf of our government, English is Mr. Varshney's second language and he speaks with a strong accent. While employed with Parsons and MDA, Mr. Varshney was the target of ethnically charged and ageist comments and actions multiple times by younger, white employees of Defendants. For example, younger, white employees of Parsons and MDA employees would frequently exclude Mr. Varshney from conversations while he was present in meetings. They would use names for Mr. Varshney like "This Thing" even when he was sitting right next to them and would complain that they could not understand his Indian accent. Coworkers would pretend that Mr. Varshney did not exist by directing their answers to his questions to white employees, ignoring him entirely. On one occasion, refreshments were offered during a meeting to younger, white employees,

but not to Mr. Varshney. These acts and statements are just a small sampling of the discriminatory treatment he was subjected during his employment with Defendants.

44.     Defendants consistently treat others outside Mr. Varshney's protected categories more favorably and fail to take similar action against younger, white employees. For example, during a live and ongoing classified meeting, where cell phones and unclassified computers are not allowed, a younger, white employee opened an unclassified computer and began working. That employee was simply tapped on the shoulder and reminded that he was committing a security violation. To Mr. Varshney's knowledge, that incident was never reported and the individual was not terminated or even disciplined. Younger, white employees have also been permitted to take photos inside the MDA Huntsville building without any repercussions. On another occasion, a younger, white employee tested positive for drugs and was given only a short, temporary suspension.

45.     Finally, Parsons has a pattern and practice of terminating senior and older employees in order to save money. When Parsons needs to reduce its workforce, it routinely discriminates against older employees either by terminating them or offering them lower-paying positions. It does so instead of taking action against younger employees because the older employees have higher salaries and it yields higher profits.

**The Aftermath**

46.    Believing his termination to have been a misunderstanding, and desiring to be reinstated, Mr. Varshney attempted to resolve his termination through Parsons' Employee Dispute Resolution ("EDR") Procedure. Parsons claims this procedure is designed to "provide a more flexible, simpler method of resolving disputes" and is "fast," "confidential," "cost effective," "simple," and "allows for a full range of remedies." However, when Mr. Varshney attempted to engage Parsons in the EDR process, Parsons perpetuated its discrimination by failing to participate.

47.    Mr. Varshney repeatedly requested Parsons to substantiate its allegations with evidence that accepting the two-minute, private call from his dying brother-in-law and speaking in Hindi violated MDA's and/or Parsons's security protocols or policies. Parsons refused to do so because it knows that is not possible. In fact, Parsons' story has been a moving target and has included the patently false premise that Mr. Varshney was terminated for taking the call in a conference room during a meeting where classified materials were being discussed. Put simply, Defendants' inability to "get their story straight" is just further evidence of their discriminatory conduct and disparate treatment of Mr. Varshney.

48.    Defendants' wrongful conduct did not end when it summarily fired Mr. Varshney for being a 78-year-old Indian American. Since ruining his distinguished

career, Defendants have actively taken steps to prevent him from obtaining another job. They have done so by, among other things, spreading rumors among the tight-knit MDA community that Mr. Varshney committed a serious security violation, exposed classified information, took the call in a secured conference room during a meeting, permanently lost his security clearance, and/or can no longer work in any capacity for MDA.

49.    None of this is true. As stated above, no classified information was exposed, the call was not in a secured conference room or during a meeting, and Mr. Varshney has not had his security clearance permanently revoked. Although Mr. Varshney's secret security clearance became inactive when his job with MDA and Parsons ended, it will become active again when and if he obtains another position with access to classified information. *See* ¶ 32. As Defendants well know, Mr. Varshney has received no notice of revocation from Defendants, the Central Adjudication Facility (CAF), or the Defense Office of Hearings and Appeals (DOHA).

50.    Mr. Varshney has diligently pursued other employment and interviewed for several open engineering positions that he is more than qualified to fill. Defendants' actions, however, have directly prevented him from being hired and have involuntarily ended his career, many years before he wanted to do so.

51.     Even though he remains healthy and committed to continuing his career, Mr. Varshney's age is seen by prospective employers as an impediment to hiring. Further, the vast majority of positions Mr. Varshney is qualified to hold in Huntsville are subcontracted through Parsons and/or MDA. Because of this, Mr. Varshney has been rejected for multiple job opportunities because those opportunities would also require him to be hired or affiliated with Parsons and/or MDA—both of whom have made it clear that they refuse to work with him. Upon information and belief, Parsons intentionally prevented Mr. Varshney from being hired for an open position at MDA and falsified information about him and the circumstances surrounding his termination.

52.     Stated differently, Defendants have intentionally blackballed Mr. Varshney from his life's work and have subjected him to embarrassment and ridicule. Mr. Varshney has suffered extreme emotional and financial impact at the hands of Defendants. The monetary damages incurred by Mr. Varshney as a direct and proximate result of Defendants' discriminatory acts and omissions are in the millions of dollars.

## COUNT ONE
## Discrimination in Violation of Title VII of the Civil Rights Act

53.     Mr. Varshney adopts and incorporates the allegations in Paragraphs 1 through 52 as if set forth fully herein.

54.     Mr. Varshney is Indian, has brown skin, and was born in India.

55.   Mr. Varshney was qualified for his position when Defendants discriminated against him.

56.   Defendants subjected Mr. Varshney to racial discrimination by, among other things, the acts described herein (and those unknown to him), including but not limited to: (1) subjecting him to racially offensive conduct; (2) falsely reporting him for a security violation; (3) claiming or reporting that he committed prior security violations; (4) failing to conduct an investigation or provide Mr. Varshney with any due process; (5) failing to follow established procedure; (6) revoking his MDA privileges; (7) terminating his employment; (8) refusing to reinstate him; (9) failing to participate in EDR; (10) perpetuating the false narrative that he committed a serious security violation; (11) misrepresenting the facts surrounding the call to employees and third parties; (12) taking actions designed to prevent him for working with MDA; and/or (13) otherwise ending his distinguished career.

57.   Mr. Varshney's race was a reason and motivating factor for these acts and omissions.

58.   Defendants have a habit and/or practice of discriminating based on race and condoning and/or allowing racial discrimination.

59.   Defendants treated similarly-situated employees outside of Mr. Varshney's protected categories more favorably.

60.     Upon information and belief, Defendants replaced Mr. Varshney with a white employee.

61.     Defendants intentionally violated Mr. Varshney's rights under Title VII, with malice or reckless indifference.

62.     As a result of Defendants' unlawful discriminatory actions, Mr. Varshney suffered damages in an amount to be determined by a trier of fact.

**COUNT TWO**
**Violation of the Age Discrimination in Employment Act**

63.     Mr. Varshney adopts and incorporates the allegations in Paragraphs 1 through 52 as if set forth fully herein.

64.     Mr. Varshney is 78 years old.

65.     Mr. Varshney was qualified for his position when Defendants discriminated against him.

66.     Defendants subjected Mr. Varshney to age discrimination by, among other things, the acts described herein (and those unknown to him), including but not limited to: (1) subjecting him to racially offensive conduct; (2) falsely reporting him for a security violation; (3) claiming or reporting that he committed prior security violations; (4) failing to conduct an investigation or provide Mr. Varshney with any due process; (5) failing to follow established procedure; (6) revoking his MDA privileges; (7) terminating his employment; (8) refusing to reinstate him; (9) failing to participate in EDR; (10) perpetuating the false narrative that he committed a

serious security violation; (11) misrepresenting the facts surrounding the call to employees and third parties; (12) taking actions designed to prevent him for working with MDA; and/or (13) otherwise ending his distinguished career.

67.     Defendants committed these discriminatory acts and omissions because of Mr. Varshney's age.

68.     Defendants have a habit and/or practice of discriminating because of age and condoning and/or allowing age discrimination.

69.     Defendants treated similarly situated, younger employees more favorably.

70.     Upon information and belief, Defendants replaced Mr. Varshney with a younger employee.

71.     Defendants intentionally violated Mr. Varshney's rights under the ADEA, with malice or reckless indifference.

72.     As a result of Defendants' unlawful discriminatory actions, Mr. Varshney suffered damages in an amount to be determined by a trier of fact.

**COUNT THREE**
**Violation of the Alabama Age Discrimination in Employment Act**
**(Defendant Parsons)**

73.     Mr. Varshney adopts and incorporates the allegations in Paragraphs 1 through 52 as if set forth fully herein.

74.     Mr. Varshney is 78 years old.

21

75.     Mr. Varshney was qualified for his position when Defendant Parsons discriminated against him.

76.     Defendant Parsons subjected Mr. Varshney to age discrimination by, among other things, the acts described herein (and those unknown to him), including but not limited to: (1) subjecting him to racially offensive conduct; (2) falsely reporting him for a security violation; (3) claiming or reporting that he committed prior security violations; (4) failing to conduct an investigation or provide Mr. Varshney with any due process; (5) failing to follow established procedure; (6) terminating his employment; (7) refusing to reinstate him; (8) failing to participate in EDR; (9) perpetuating the false narrative that he committed a serious security violation; (10) misrepresenting the facts surrounding the call to employees and third parties; (11) taking actions designed to prevent him for working with MDA; and/or (12) otherwise ending his distinguished career.

77.     Defendant Parsons committed these discriminatory acts and omissions because of Mr. Varshney's age.

78.     Defendant Parsons has a habit and/or practice of discriminating based on age and condoning and/or allowing age discrimination.

79.     Defendant Parsons treated similarly situated, younger employees more favorably.

80. Upon information and belief, Defendant Parsons replaced Mr. Varshney with a younger employee.

81. Defendant Parsons intentionally violated Mr. Varshney's rights under the AADEA, with malice or reckless indifference.

82. As a result of Defendant Parsons' unlawful discriminatory actions, Mr. Varshney suffered damages, including for emotional distress, in an amount to be determined by a trier of fact.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Varshney respectfully requests judgment as follows against Defendants, jointly and severally:

A.  Award Mr. Varshney his past and future loss of wages and benefits, plus interest;

B.  Order Defendants to reinstate Mr. Varshney's privileges that were in existence as of September 26, 2022;

C.  Order Defendants to remove and/or revoke any disciplinary records from Mr. Varshney's personnel file(s);

D.  Order Defendants to reinstate Mr. Varshney to a position comparable to his former position or, in lieu of reinstatement, award him front pay (including benefits);

E.  Award Mr. Varshney compensatory damages, including but not limited to damages for mental anguish and emotional distress;

F.  Award Mr. Varshney punitive and liquidated damages;

G.  Award Mr. Varshney all costs and reasonable attorneys' fees incurred in connection with this action; and

H.  Grant such additional or alternative relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Mr. Varshney demands a trial by jury on all issues so triable.

*/s/ Jennifer H. Wheeler*
Walter A. "Tod" Dodgen
John B. Holmes, III
Jennifer Hanson Wheeler
*Attorneys for Plaintiff Anil Varshney*

OF COUNSEL:
Walter A. "Tod" Dodgen
Maynard Nexsen PC
665 Gallatin St SW
Huntsville, AL 35801
Telephone: (256) 551-0171
Fax: (205) 254-1999
Email: tdodgen@maynardnexsen.com

John B. Holmes, III
Jennifer Hanson Wheeler
Maynard Nexsen PC
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
Telephone: (205) 254-1000
Fax: (205) 254-1999
Email: jholmes@maynardnexsen.com
            jwheeler@maynardnexsen.com

**PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL AS FOLLOWS:**
Parsons Corporation
c/o CT Corporation System
4701 Cox Rd Ste 285
Glen Allen, VA 23060

Lloyd J. Austin, Secretary of Defense
United States Department of Defense
1000 Defense Pentagon
Washington, DC 20301-1000